Anderson, J.
The inducement to the passage of the *553 act of March 3d, 1866, known as the adjustment act, is shown by the preamble. It was designed to establish some uniform and equitable rule for the adjustment of liabilities under contracts which were made, or obligations which were incurred, during the late war, on the basis of Confederate States treasury notes. To this end section one provides “that in any action, suit or other proceeding, for the enforcement of any contract, express or implied, made and entered into between the 1st of January 1862, and the 10th of April 1865, it shall be lawful for either party to show, by parol or other relevant evidence, what was the true understanding and agreement of the parties, either express or to be implied, in respect to the kind of currency in which the same was to be fulfilled or performed, or with reference to which as a standard of value it was made and entered into.”
This section prescribes a new rule of evidence in actions, suits or other proceeding, for the enforcement of certain contracts. What contracts? Such as were made and entered into between the 1st day of January 1862, and the 10th day of April 1865. But is it applicable only to a particular class or description of contracts entered into between those periods ? or to all except a particular class or description ? The language embraces all, without exception. It is “any contract, express or implied,” &c. It plainly embraces, therefore, all contracts made and entered into between those periods, whether written or not written, uuder seal or not under seal, express or implied—any contract. The only limitation is that it must have been made or entered into between the periods designated.
And what rule of evidence is authorized and prescribed in actions, suits or other proceeding, for the enforcement of such contracts ? It is, that either party may show, by parol or other relevant evidence, what was the true understanding and agreement of the parties, either ex *554 pressed or implied, as to the kind of currency in which the contract was to be fulfilled, &c. If the contract was not in writing, such evideuce would have beeu admissible, independent of this enactment. But it was the design of the Legislature to enlarge the rule, and to apply it to all contracts made between those periods, in order to ascertain what was the true understanding and agreement of the parties as to the kind of currency in which they were solvable, no matter what was the form of the contract or how expressed. The design was to get at the intention and true understanding of the parties, whether expressed or implied; and to this end it is enacted that it shall be lawful for either party to show it by parol or other relevant evidence. The language is very comprehensive—parol or other evidence that is relevant. The only limitation is, that it shall be relevant. And such evidence is admissible, whether the suit be brought to enforce a contract in writing and under seal, or a verbal contract, an express or an implied contract—“any contract,” if it were made and entered into between the periods designated. There is no exception of contracts under seal or in writing, and no qualification “to explain an ambiguity.” With such restrictions and qualifications, there was no necessity for auy legislative interference; for, subject to these limitations and restrictions, parol, or other relevant evidence, was admissible, independent of this legislative enactment. It is true that, in effect, it abrogates the common-law presumption that a contract to pay so many dollars was a contract to pay so much money in specie ; and so far as the act of Assembly of October 20th, 1863, raises a conclusive presumption that contracts made after a certain period shall be deemed to be paid in a particular currency, it is in conflict with this act, and is in effect repealed thereby. Walker, per rep. v. Pierce, 21 Gratt. 722. But it is not restricted to this office. Every contract made between those periods is thrown open to the intro *555 duction of parol, or other relevant evidence, to disclose what was the true understanding and agreement of the parties, either express or to be implied, as to the kind of currency in which it was solvable, or in reference to which, as a standard of value, it was entered into. And such evidence is admissible to explain, vary or contradict the written evidence of the contract, with a view to ascertain what was the true understanding and agreement of the parties as to the kind of currency in which it was to be fulfilled, &c., to be weighed by the court, or jury, as the case may be. Such, in my opinion, is the obvious meaning of the act; and as its operation is limited to contracts for the payment of money in currency, made and entered into between the 1st of January 1862, and the 10th of April 1865, and extends to none other, there is mr cause for alarm that the old and established rules of evidence, which do not allow written contracts to be varied or contradicted by parol evideuce, may, in general, or permanently, be overturned. "Whether the extraordinary condition of the country justified this extraordinary legislation in relation to contracts entered into during that period, and this departure from the well established rules of evidence in relation to them, was a question for the legislature. But I do not hesitate to say that, in my opinion, justice required it; and its operation has shown that its enactment was wise and beneficent.
With this construction and understanding of the law, it is clear that it was competent for either party in this cause to introduce parol or other relevant evidence, besides the evidence of the bond, to show what was the true understanding and agreement of the parties as to the kind of currency in which the bond upon which the suit is brought is solvable. It is expressed in the bond that it is to be paid “in such funds as the banks receive and pay out.” In a former opinion in this cause, I imperfectly attempted to show that this language unex *556 plained by other evidence, imports, although the debt was payable two years after date, that it was to be paid in such funds as the banks received and paid out at its date. I am still of that opinion. But it must be admitted that the parol evidence which was introduced rather militates against that construction, as the parties themselves seem to have considered that it might be payable in a better currency than the banks were then receiving and paying out. I shall therefore so treat it in what I have further to say.
In what sort of currency was it solvable, according to the true understanding aud agreement of the parties ? Bid they contemplate or intend, in their contract, that it should be paid in United States or Confederate States currency? Whatever was the intention of the parties should be carried out. That is their contract.
The surrounding circumstances tend to show that they ■did not intend to contract for the payment in United States currency. They were both citizens of Virginia, which was one of the Confederate States, against whom the United States was waging a fierce and devastating war. By the laws of their country it was a penal offence to receive aud pay out United States currency. “And even if they intended (I quote from the opinion referred to) that payment should be made in such funds as the banks were receiving and paying out at the maturity of the contract, they intended the banks which then operated in the State, or which might be afterwards created by the government of Virginia, or of the Confederate States, and be subordinate to those governments, and which dealt in funds which were created or authorized by the Confederate government, or by Virginia, as a member of the Confederacy. It was no part of their contract, and never entered their heads (so far as this record shows), that payment was to be made in such funds as were received aud paid out by United States banks, or by banks which were subject to the *557 government of the United States, or in the currency of the United States government.” Neither of them says, in testifying, that it was contemplated that the war might terminate unfavorably to the Confederate States before the maturity of the bond, and that they contracted with reference to such a contingency. On the contrary, the proof is that whilst it was regarded, in some sense, a contract of hazard, the hazard was with regard to the appreciation or depreciation of Confederate currency. That is the testimony of the principal obligor, as to his understanding of the contract. And it is not contradicted by the obligee, or by any evidence in the cause. He says he expected to get a better cui’rency. But he does not pretend to say that he expected to be paid in United States currency. If such was his expectation or understanding, the presumption is he would have said so. And not having said so, he must he understood to mean that he anticpated an improvement in the Confederate currency, and expected to be paid in a better Confederate currency. And so considered, his testimony is in harmony with the defendants’. If it were otherwise, his testimony is in conflict with the other testimony in the cause, and upon a well established rule, the bill of exceptions could not be regarded. I conclude, therefore, that the parties meant such funds as the banks of Virginia, as a member of the Confederacy, received and paid out. “ They were receiving and paying out the same kind of currency which the plaintiff loaned to the defendants. And they were the only hanks known to the parties.” They had nothing to do with any other banks. I think, therefore, that the jury might well have concluded that the evidence did not satisfactorily show that it was the intention of the parties to make a contract of hazard contingent upon the result of the war.
This is an application to the appellate tribunal to reverse the judgment of the court of trial overruling a *558 motion to set aside the verdict of the jury, upon, the ground that it is contrary to the evidence, upon a certificate of the facts proved upon the trial. In Patterson v. Ford, 2 Gratt. 19, 23, Baldwin, J. thus clearly states the law with regard to new trials. He says “the only power of the court is to set aside the verdict and to direct a new trial to be had before another jury; a power which is exercised when the case seems to l’equire it, in order to prevent gross injustice, or to preserve obedience to the law; or to maintain the authority of the court in its exposition of the law to the jury; or where, from fraud or surprise, a fair trial has not been had on the merits. The court may grant a new trial where the verdict is contrary to law or evidence; but the duty of doing so is not in all cases imperative. There are various considerations which may be brought to bear upon its discretion, such as the doubtful character of the question, the hard or unconscionable nature of the action or defence, the belief that the verdict conforms to the substantial equity and justice of the ease, the trifling value of the matter in controversy, and others that might be mentioned.” And he holds that courts may sustain verdicts “that attain substantial justice, though unwarranted by close deduction, or rigid analysis, or strict adherence to legal principles.” He says “the books are full of such eases, and the idea has been carried to great lengths in oppressive or iniquitous actions or defences.”
Is this verdict a plain deviation from the evidence ? Or is it necessary to set it aside, in order to prevent gross injustice? On the contrary, does it not attain substantial justice between the parties ? And to set it aside, would it not be in furtherance of a hard and unconscionable action? Hid the judge of the Circuit court err, therefore, in the exercise of a sound discretion, in overruling the motion to set it aside ? He certifies that the verdict was, in his opinion, “in accordance with the *559 true understanding and agreement of the parties, and did substantial justice between them; and that while the evidence showed that it was, to some extent, regarded by the parties as a contract of hazard, the hazard understood and intended was confined to fluctuations of Confederate currency.” And now, although we might not be satisfied that the opinion of the judge is correct, that the verdict is in accordance with the true understanding and agreement of the parties, yet much respect is due to the opinion of the jury, whose province it is to weigh the evidence, “to estimate the force of circumstances, probabilities and presumptions, and to canvass intentions and motives”; and the judge who presided at the trial and heard all the evidence, being brought to the same conclusions with the jury, and all agreeing that the verdict attained substantial justice between the parties, and that to set it aside would be in furtherance of an inequitable, hard and unconscionable action, it is peculiarly a case proper for the appellate tribunal to refuse to disturb the verdict. The verdict allows the plaintiff interest from the date of the bond, and in other respects, may not be in strict conformity to legal principles, or to the contract between the parties; but these, if they be errors, are not to the prejudice of the plaintiff'; and of them the defendants do not complain. I am, therefore, of opinion to affirm the judgment of the Circuit court.
Staples, J.
This case was argued and decided at the last term of the court here. A motion was then made for a rehearing, which, by consent of counsel, was held under advisement until the November term inRichmond. The motion was, however, not acted on in Richmond in consequence of the great press of business upon the ■court during its winter session. While, however, the motion was under consideration, the opinion of the court accidentally found its way into the hands of the reporter, . and is reported in the 21 vol. of Grattan. When the mis *560 take was discovered, it was too late to correct the error without seriously retarding the publication of other eases then already printed. Under these circumstances, the report of the case has been much regretted by the judges ; but it would not affect their solemn obligation to reconsider the decision previously made, if in the interest of justice and law such reconsideration was necessary and proper. To use the language of Judge Roane in Dilliard v. Tomlinson, 1 Munf. 183, 199 : “ In coming to this decision in favor of a reconsideration, the court was justified by innumerable precedents in this court, in which the court has admitted its own fallibility and corrected its former errors. I will mention in particular the case of Bedinger v. Commonwealth, 3 Call, 461, in which this court disclaimed a jurisdiction which it had exercised in many former instances ; two of which had also gotten into print (a circumstance which with upright judges certainly can make no difference), and in which the judges had also delivered seriatim opinions.”
It is due to myself to state, that I was not satisfied with some of the views announced in the prevailing opinion, at the time it was delivered. Subsequent reflection satisfies me that my doubts were well founded, and that the doctrines enunciated in that opinion, in reference to the admission of parol evidence in this class of cases, should be considerably modified, if not entirely overruled. I propose now to give the reasons which have led me to this conclusion.
It will be observed that the bond which is the subject of controversy, bears date 9th June 1863, and stipulates for the payment, two years after date, of five thousand dollars, without interest, and in such funds as the banks receive and pay out. It is insisted, that the defendant cannot be permitted to show by parol evidence, that this contract, according to the true understanding and agreement of the parties, was to be performed in Con *561 federate States treasury notes. The argument upon this point is that the act of March 3rd, 1866, was rendered necessary by the use of the word “dollars” in a large majority of the contracts made daring the war ; and that its provisions do not apply where the parties have themselves stipulated the kind of currency in which the obligation is to be paid.
There are several objections to this construction. In the first place the statute makes no such distinction. It embraces every- contract for the payment of money or currency entered into within the periods designated by the act. The first section declares, that in any actiou or suit for the enforcement of any contract, express or implied, entered into between the 1st day of January 1862 and the 10th day of April 1865, it shall be lawful for either party to show by parol or other relevant evidence, what was the true understanding and agreement of the parties, either expressed or to be implied, iu respect to the kind of currency iu which the same was to be fulfilled or performed, or with reference to which as a standard of value it was made and entered iuto. It is impossible that language could be more comprehensive. It applies to every contract within the periods mentioned, whether express or implied, whether by'parol or by deed, whether payable in .dollars simply or in currency. There is no restriction, no exception. And I do not think we are authorized, upon any considerations of apprehended-hardship or mischief, or mere conjectures of legislative intention, to restrict the operation of the statute to a certain class of contracts, in violation of this plain and positive language.
In the second place a promise to pay a specific sum in “ dollars,” or to pay so many dollars, is a contract to pay a particular kind of currency. It t is a contract to pay a specie currency. This is the legal effect of such a promise, according to universal understanding in Virginia. This rule has of course been modified by the- *562 legal tender acts ; but the principiéis not affected. Now it is well settled, that at common law parol evidence is not admissible to vary the legal effect of a written obligation. The reason is, that when the legal import is clear and definite,' the intention of the parties is, for all substantial purposes, as distinctly aud as fully expressed as if they had written out in words what the law implies. This principle received the unanimous approval of this court in Woodward, Baldwin & Co. v. Foster, 18 Gratt. 200. When, therefore, the obligor is permitted to show by parol, that in using the word “ dollars”, he did not mean either coin or legal tender notes, but a worthless depreciated paper money, he is permitted to apply the statute to an instrument of writing in which the kind of currency is specified, and • to coutradict the positive language, the express terms of his obligation.
It seems to me, therefore, the distinction sought to be made, in respect to the admission of parol evidence, between contracts which do, and those which do not, specify the kind of currency in which the debt is to be paid, is not sound. In the one case, the. effect of the evidence is to vary the express terms, and in the other, the legal import of the instrument.
The same principle applies, when the obligation is for the payment of a specific sum in current funds at a future day. This as clearly imports a promise to pay in funds current at the period of payment, as if it were expressed in so many words. And yet it is the constant practice under the statute, to permit either party to show by or,al testimony, the real understanding to have been a payment in the money current at the date of the contract. Meredith v. Salmon, 21 Gratt. 762, and cases there cited; Taylor v. Turley, 88 Maryl. R. 500. If there is any substantial distinction between an obligation to pay in current funds and an obligation (like the present) to pay in such funds as the banks receive and pay out, I am unable to perceive it. As a general rule, whatever *563 the banks receive and pay out is current in the country ; and whatever is current in the country the banks readily receive and pay out. The parties as plainly stipulate in the one case as in the other, the kind of currency in which the contract is to be fulfilled. And if parol evidence is admissible in one instance, it is equally so in the ■other. There is no substantial ground for the application of different rules of evidence in the cases.
It seems to be supposed, however, that a bond or note ' for the payment of current funds at a future day, is ambiguous on its face. In other words, it is not absolutely certain whether the parties had reference to funds current at the date or at the maturity of the instrument; and it is, therefore, competent to show what they really intended. This may be so. If, however, this reasoning be correct, and the statute is to be construed as only applying to instruments of doubtful meaning, there would seem to be but little necessity for its enactment; and but little good resulting from its provisions. It would not be difficult, however, to show that the bond now under consideration, is by no means free from ambiguity. The promise is to pay “in such funds as the banks receive and pay out.” It is not a contract to pay in such funds as the banks shall receive and pay out; or may receive and pay out; or shall then receive and pay out, but such “funds as the banks receive and pay out.” It is in the present tense, and may have reference to the currency in circulation when the instrument was executed. At any rate, it is a case peculiarly proper for' the admission of parol or auy relevant evidence, in order to ascertain the real understanding and agreement of the parties. Such evidence does not, in fact, necessarily vary or contradict the writing. It does not deny that the obligation was to be performed in bankable funds. Its object is simply to ascertain what banks were in the contemplation of the parties. Did they have reference to the Virginia banks, the banks then in existence, or *564 to the hanks of some foreign government, thereafter to be established ? Did they mean the currency then in circulation, i’ecognized by the laws, the government and the people, or some other and better currency issued under the authority of a different goverment ? Did they intend to speculate upon the loss of the cause, or having perfect confidence in its success, was it simply intended to provide against the contingency of paying a specie currency? These are enquiries important to be made in this case, and in all cases relating to the contracts of that period. They must have been in the mind of the Legislature when it authorized the true understanding and agreement to be shown without regard to the form of the instrument executed by the parties.
The rule that parol evidence is inadmissible to contradict or vary the terms of a valid written instrument, is a rule of the commou law established by the courts, and founded upon considerations of public policy and convenience. It is not confined to deeds and instruments of a more solemn nature, but extends to every class of contracts reduced to writing. A mere note of hand can no moi’e be contradicted than a deed. The reason, as stated by a great author, is, it would be inconvenient that matters in writing made by advice and on consideration, and which finally import the certain truth and agreement of the parties, should be controlled by an averment to be proved by the uncertain testimony of slippery memory. It is, however,' a mere rule of evidence. It is subject to many important exceptions and modifications, allowed by the good sense of the courts, to meet the exigencies of advancing civilization, trade and commerce. While recognizing the rule as unquestionable, and its authority as absolutely binding, the courts, in many instances, have frittered it away by nice and subtle distinctions, difficult to be understood or reconciled with the rule itself. But, however firmly the rule is established, it may be changed or modified, and *565 even abolished, by legislative authority. In such case, the law does not impair the obligation of the contract, but resorts to other modes to ascertain what it is. This principle is laid down in Cooley on Constitutional Limitations. It appears also that a right to be governed by existing rules of evidence is not a vested right. These rules pertain to the remedy which a State gives to its citizens, and are not regarded as entering into or constituting a part of the contract, or as being the essence of a right. They are, therefore, at all times subject to the modification and control of the Legislature, like other rules affecting the remedy, and the changes which are enacted may be made applicable to existing causes of action, even in those States where retrospective laws are forbidden. It has, therefore, been held that a statute which modifies the common law rule excluding parol evidence to vary the terms of a written contract, was not objectionable as applied to existing causes of action. These principles received the uuanimous approval of this court in the case of Crawford v. Halsted & Putnam, 20 Gratt. 211.
In enacting the statute now under consideration, it seems to have been the intention of the Legislature utterly to abrogate the common law rule which prohibits proof of any contemporaneous parol agreement where there is a written instrument. Instead of perplexing the courts with difficult questions, by confining, or attempting to confine, the operation of the statute to a certain class of contracts, the Legislature probably deemed it best to permit a full investigation in every case, leaving it to the good sense of judges and juries to give due weight to the plain unambiguous writings of the parties.
When we consider the extraordinary condition of affairs created by the war—the perplexity, the anxiety and confusion pervading all classes of society; the want of care, deliberation, and oftentimes of legal counsel, in the preparation of written instruments; the fact that *566 nine-tenths of the people were participating, in some-form, in the gigantic contest then being conducted; it is impossible to say that this innovation upon the common law is not founded upon wisdom and sound policy.
' “ It would be inconsistent,” says Lord Coke, “ that matters in writing, made by advice and on consideration, should be controlled by an averment of parties.” How is it possible, with any degree, of consistency, to apply that principle to a people, three-fourths of whose territory was overrun by invading armies, and whose minds were-agitated with perpetual apprehensions of danger ? Can it be said that matters put in writing at such a period were made by advice and on consideration ? The Legislature has acted upon no such narrow and rigid rule of public policy. It *has provided a remedy for evils growing out of an unprecedented condition of affairs, which should be liberally and beneficially.applied by the-courts.
It has been said that this construction of the statute unsettles the law, and is in conflict with previous decisions. I am not aware that this precise question has-been before this court directly for adjudication. I am confident that no case can be found—not even the dictum of any judge of this court—inconsistent with the views here advanced. The cases of Boulware v. Newton and Kraker v. Shields have been cited, but those cases did not involve the point now under discussion.
In Boulware v. Newton, there was proof that the note in controversy was given upon a loan of Confederate treasury notes of their value at the time of the loan; but no effort was made, no evidence offered, to establish a parol agreement dehors the writing. Judge Iiives, in delivering the opinion of the court, said the legal construction of the instrument received no aid from extrinsic evidence. There is not the slightest intimation that such evidence, if offered, would not have been received and considered. The decision in Kraker v. *567 Shields, 20 Gratt. 377, was placed mainly on the ground that the vendor, in expectation of a better currency in a short time, expressly refused to sell his laud except upon the terms of receiving the deferred instalments in money current when the bonds matured, and those terms were communicated to the purchaser and agreed to by him. In Morgan's adm’x v. Otey, 21 Gratt. 619; Walker v. Page, Id. 722; Meredith v. Salmon, Id. 762, parol testimony was admitted without objection, and relied on to show the real contract and understanding of the parties. These cases, if they have any bearing at all upon the question here, tend strongly to sustain the views now expressed. They are certainly not in conflict with anything I have said. The practice of the courts throughout the State, so far as my observation extends, has been in conformity with this construction. In the meantime, no complaint has been made of the operation of the law, no effort made to secure its repeal or amendment, and no appeal taken to this court upon the ground of the improper introduction of parol evidence to affect the written contracts of the parties.
The learned counsel for the plaintiff’ seems to have construed the statute in the same way. In this very case he himself not only set the example of introducing parol evidence, hut he allowed the defendant to do the same thing without objection. Neither in his petition, nor his oral argument before this court, did he raise any question of the kind. The objection was first made in the opinion of a majority of the judges.
I am now satisfied it is better for us—the part of wisdom and sound policy—to retrace our steps, and give our sanction to the general construction of this statute as adopted in the State. Any attempt on our part to distinguish between the cases—to apply the statute to particular contracts—will only confuse and mislead the courts and profession, and fill the docket here with appeals which otherwise would never he taken.
*568 On tlie other hand, the mischief, if any, resulting from a liberal construction of the statute, is very limited in its character. It is confined to written obligations for the payment of money entered into during the existence of the war, aud predicated on Confederate States treasury notes. These are the'contracts creating rights and imposing liabilities, perplexing alike to debtor and creditor, within the true intent and meaning of the statute. If this be an unwise and dangerous innovation, the remedy is not in the courts, but in the power that enacted tbe law.
My opinion then is, that the parol evidence adduced in this case was clearly admissible. Being admissible does it sustain or justify the verdict? Judge Anderson has so fully discussed this branch of the subject, I do not deem it necessary to do more than to devote a few moments to the consideration of the evidence. In the first place, it may be a question whether the Circuit judge has stated the facts, or merely the evidence adduced at the trial. It is true, that in the commencement of the bill of exceptions, he professes to certify the facts; but throughout he merely gives the statement of the witnesses ; aud in conclusion he says this being all the evidence. The judge, however, certifies, that in his opinion the verdict was in accordance with the true understanding and agreement of the parties, and did substantial justice between them, and that while the evidence showed that it was to some extent regarded by the parties as a contract of hazard, the hazard understood and intended, was confined to the fluctuations of Confederate currency. This is the conclusion drawn by the judge as well as the jury, from the evidence, aud is, I think, entitled to as much weight as his certificate of the statements of the witnesses ; and this upon the principle announced in Slaughter v. Tutt, 12 Leigh, 163. It was said in that case, that although “ the facts may be certified by the judge, still respect should be paid to the *569 verdict ancl judgment of the trying court, because in many cases a fair presumption might arise that a fact necessary to warrant or repel the inference drawn, had been omitted in the certificate of facts; and because that should be held as rightly determined which the facts do not show to be wrong. It is very clear that in this ease the facts certified do not establish that the case was not rightly determined. See Brugh v. Shanks, 5 Leigh, 598 ; Harnsbarger’s adm'r v. Kinney, 6 Gratt. 287.
Conceding, however, that the verdict is not strictly warranted by the evidence, is it the duty of this court, under all the circumstances, to grant a new trial? The opinion of Judge Baldwin, speaking for the court, in Patterson v. Ford, 2 Gratt. 23, is an answer to the question. “ The court (he said) may grant a new trial where the verdict is 'contrary to law or evidence, but the duty of doing so is not in all cases imperative. There are various considerations which may be brought to bear upon its discretion; such as the doubtful character of the question, the hard or unconscionable nature of the action or defence, the belief that the verdict conforms to the substantial justice and equity of the case, and others that might be mentioned.” He further says, it is the constant practice of the court to sustain verdicts that attain substantial practice, though not strictly warranted by the evidence or strict adherence to legal principles. In illustration of this principle he cites the case of Wilkinson v. Payne, 4 T. R. 463. In that case the action could only be sustained by the presumption of a legal marriage, of which there was no evidence; though the fact might have been proved if it had occurred, and all the probabilities were against it. The jury, however, presumed the marriage and found a verdict for the plaintiff. A new trial was refused by the Court of King’s Bench. Lord Kenyon, C. J., said: "In the case of new trials, it is a general rule, that in a hard action where there is something on which the jury have raised *570 a presumption agreeably to the justice of the case, the court will not interfere by granting a new trial where the objection does not lie in point of law. The same principle runs through all the decisions. Applications for new trials are founded upon the supposition that some injustice has been done; and without proof to tliat effect, it is believed that the applications are invariably denied.”
“To induce the granting of a new trial there should be strong probable grounds to believe that the merits of the case have not been fully and fairly tried, and that injustice has been done.” See on this subject 2 Graham & "Waterman on New Trials, page 48, where a largo number of cases are collected, illustrating this principle: Also, 2 Black. Com.; 2 Tucker Com. 302.
These rules are laid down with reference to applications made to judges in the inferior courts, who preside at the trial. They apply with much greater force when the appellate jurisdiction is invoked to set aside a verdict approved by the nisi prius judge.
In the present case, the claim is to a ^recovery of of $5,000 of principal money, and more than $2,000 of interest, in a sound currency, upon a loan of $5,000 in depreciated paper of the value of $625, at the date of the loan. What is there in such a claim that should induce this court to interfere in its behalf ? It is the contract we are told. The jury of the viciuage with the paper and both parties before them in explanation of its provisions, their motives and intentions, have said there was no such contract. The judge who heard the evidence, agrees with them. Conceding that an appellatecoui’t has the right to disturb such finding, is it under an imperative duty to do so ? I think not. So thinking I will let the verdict stand.
Much has been said of the inviolability of contracts, and of the duty of enforcing them. All this meets my hearty concurrence. Hot a word has fallen from me at’ any time, in opposition to this doctrine. But I repeat *571 now what I have always said, that I am not inclined, if I can help it, to award to parties in the present currency, the nominal amount of debts contracted with reference to a highly depreciated Confederate currency. If this be the contract, plain, unmistakable, I suppose we must enforce it, if valid in other respects. But if there be any reasonable doubt as to the true meauing of the parties, that doubt should be resolved in the interests of humanity and justice.
These are my reasons for refusing a new trial in this case. It will be seen they are in conflict with the opinion delivered at the last term; in which I then expressed my concurrence. Upon mature reflection, I am satisfied the views then entertained are erroneous. If there are any disposed to criticise this change of opinion, I can only answer, that no false pídele shall constrain me to adhere to opinions when convinced they are erroneous. Whatever may be my defects as a judge, to persist in conscious error is not one of them. I eau afford to be right at the expense of consistency; but I cannot afi’ord to he consistent at the expense of my conscience. In this I am fortified by the example and the teaching of great judges, who have not hesitated to retrace their steps taken in a wrong direction. There is one especially, a man of the purest character and the greatest learning who did uot hesitate, on a memorable occasion, publicly to retract the opinions of a lifetime. I allude to Judge Cabell, one of the foremost chancellors of his generation. He was the great representative and advocate of the doctrine of fraud per se, as it was termed. His opinions on this question in various cases, were characterized by the greatest ability and learning. But when the memorable ease of Davis v. Turner, 4 Gratt. 422, 471, was befoi’e this court, in an argument of great length and power, he announced an entire change of opinion. He thus concludes : “ Some of the opinions now expressed, are widely different from those which I *572 have heretofore entertained. The revolution has not keen effected without a struggle ; not that I have for a moment permitted the pride of self-consistency to stand in the path of duty ; but because from the very constitufi°n of our nature, we feel a prejudice in favor of opinions long formed and often acted on, which for a time at least, closes our eyes against the light that would show that we have erred. But I am convinced, and I cheerfully retrace my steps, by heartily concurring in the judgment about to be prouounced, and which will restore the law to the solid foundations of good sense and sound reason, on which it originally stood. And Lord Hardwicke says, in Galton v. Hancock, 2 Atk. R. 438, in announcing an entire change of opinion upon a question before him, “These are the reasons which induced me to alter my opinion, and I am not ashamed of doing it, for I always thought it a much greater reproach to a judge to continue in his error than to retract it.” Fortified by such examples,_I have no difficulty in retracting my error.